IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-28-RM-1

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.      CANDELARIA VALLEJO-GALLO,

      Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Cyrus Y. Chung, Assistant United States Attorney for the District of Colorado, and the defendant, Candelaria Vallejo-Gallo, personally and by counsel, Mark C. Johnson, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.  This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

## I.    AGREEMENT

### A.  Defendant's Plea of Guilty:

The defendant agrees to

(1)      plead guilty to Counts 2 and 52 of the First Superseding Indictment charging violations of 21 U.S.C. § 846, conspiracy to distribute and possess with intent to distribute 50 grams and more of methamphetamine (actual) and 500 grams and more of a mixture and substance containing a detectable amount of methamphetamine, 500 grams and more of a mixture and substance containing a detectable amount of cocaine, and 400 grams and more of a mixture and substance containing a detectable amount of N-phenyl-N- [1-(2-phenylethyl)-4- piperidinyl] propanamide (fentanyl), Schedule II controlled substances; and 1 kilogram and more of

Court Exhibit

1

a mixture and substance containing a detectable amount of heroin, a
Schedule I controlled substance; and of 18 U.S.C. § 1956(h), conspiracy
to commit money laundering, respectively;

(2)     waive certain appellate and collateral attack rights, as explained in detail
below; and

(3)     agree not to contest forfeiture as more fully described below.

## B. Government's Obligations:

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A). The government

agrees to move to dismiss Counts 1, 3 through 8, 13 through 15, 17 through 26, 28, 32

through 37, 39 through 44, and 50 through 51 of the First Superseding Indictment as

well as the Indictment [ECF No. 1] with prejudice, against this defendant only.  Should

the plea of guilty be vacated on the motion of the defendant, the government may, in its

sole discretion, move to reinstate any or all of the counts dismissed pursuant to this

agreement and potentially file a superseding indictment.

This agreement is also made pursuant to Fed.R.Crim.P.11(c)(1)(C), and the

parties agree that a sentence not to exceed 288 months is the appropriate disposition in

this case.[1]  The parties understand that, once the Court accepts the plea agreement,

the Court is required to enter the above-described sentence.  The parties further

understand that, if the Court enters a sentence other than the sentence described

above, either party has the right to withdraw from the plea agreement.

The government agrees that the defendant should receive a two-level reduction

for acceptance of responsibility pursuant to USSG § 3E1.1(a).  If the defendant does not

---

[1] The statutory maximum sentence for Count 52 is 240 months imprisonment and,
accordingly, the parties agree that the sentence for that count cannot exceed 240
months imprisonment.

engage in prohibited conduct or otherwise implicate USSG § 3C1.1, the government agrees to file a motion requesting that the defendant receive a one level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b).

### C. Defendant's Waiver of Appeal:

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

(1)     the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at a total offense level of 43;

(2)     the sentence, as to imprisonment, exceeds 288 months imprisonment; or

(3)     the government appeals the sentence imposed.

If any of these three criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255. This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

(1)     the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2)     the defendant was deprived of the effective assistance of counsel; or

(3)     the defendant was prejudiced by prosecutorial misconduct.

## D. Forfeiture of Assets

The defendant agrees to admit the forfeiture allegation in the First Superseding Indictment [ECF #72].  The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 21 U.S.C. § 853 and 18 U.S.C. § 982(a)(1), whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere.  The assets to be forfeited specifically include, but are not limited to:

a.      $65,514 in United States currency seized at 1590 South Iola St., Apt. 108, Aurora, Colorado on February 12, 2020;

b.      2015 Dodge Ram 1500, VIN: 1C6RR7KT7FS648355;

c.      2012 Chevy Camaro, VIN: 2G1FK3DJ0C9142246;

d.      Smith & Wesson, Model 59 9mm handgun bearing serial number A363459, seized from the glove box of a 2013 Chevrolet Camaro, VIN 2G1FK3N0C9142246, registered to Victor Garcia and in the possession of Candelaria Vallejo-Gallo; and

e.      Personal items seized from seized from 1590 South Iola Street, Apartment 108, Aurora, Colorado, on February 12, 2020, identified by the FBI as 20-FBI-003055 and 20-FBI-003056 and including: miscellaneous watches, miscellaneous sunglasses, miscellaneous belts and belt buckles, miscellaneous purses and shoulder bags, and miscellaneous shoes.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action. The defendant also hereby agrees that the forfeiture described herein is not excessive and, in any event, the defendant waives any constitutional claims that the defendant may have.

The defendant understands that pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters.  Having been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives her rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to her if notice is not sent within the prescribed time frames.  The defendant waives all constitutional, legal, and equitable claims arising out of and/or defenses to the forfeiture of this property in any proceeding, including any claim of innocent ownership and any claim or defense under the Eighth Amendment, including any claim of excessive fine. The defendant agrees not to petition or assist anyone else in petitioning for the remission or mitigation of the forfeiture.  The defendant further agrees to cooperate and assist the government in the forfeiture of the above-identified assets, including providing information on any third-party claims and providing testimony in any related third-party ancillary proceeding.

The defendant admits and agrees that the conduct described in the Stipulation of Facts below provides a sufficient factual and statutory basis to establish that the requisite nexus exists between the specific property subject to forfeiture and the offense to which defendant is pleading guilty.  Pursuant to Fed. R. Crim. P. 32.2(b)(1), the United States and the defendant request that at the time of accepting this plea

agreement, the Court find that the government has established the requisite nexus and enter a preliminary order of forfeiture.

The defendant agrees that the United States is not limited to forfeiture of the property described above. If the United States determines that property of the defendant identified for forfeiture cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; then the United States shall be entitled to forfeiture of any other property (substitute assets) of the defendant up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Fed. R. Crim. P. 32.2(e). This Court shall retain jurisdiction to settle any disputes arising from application of this clause. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

In addition to forfeiture, the defendant consents to the vesting of title to the listed property to the United States Government, pursuant to Title 41, Code of Federal Regulations, Section 128-48.102-1. The defendant also consents to the destruction of the property, or other disposition of the property in accordance with law, and without further notice to defendant. The defendant also agrees to sign a Federal Bureau of

Investigation Waiver of Ownership of Property form regarding certain items seized from her, her residence, or that are associated with her.

The defendant further agrees to hold the United States of America, its agents and employees, harmless from any claims whatsoever in connection with the seizure, abandonment, disposition, and destruction of the listed property.

The defendant agrees that the below-described property, which was seized from the defendant for evidentiary purposes, and which is currently in the custody or control of the FBI, was lawfully seized and that it is evidence, contraband, or fruits of the crimes to which the defendant is pleading guilty.  The defendant, as sole and rightful owner, relinquishes and abandons all claims, title, and interest the defendant has in such property with the understanding and consent that the FBI may dispose of the property without further obligations.  The specific property includes: shotgun shells and a ten-round magazine seized from 1590 S. Iola St., #108, on February 12, 2020.

## II.    ELEMENTS OF THE OFFENSE(S)

The parties agree that the elements of the offenses to which this plea is being tendered are as follows:

### Count Two:  18 U.S.C. § 846

| | |
|---|---|
| *First*: | Two or more persons agreed to violate the federal drug laws; |
| *Second*: | The defendant knew the essential objective of the conspiracy; |
| *Third*: | The defendant knowingly and voluntarily involved herself in the conspiracy; |
| *Fourth*: | There was interdependence among the members of the conspiracy; and |
| *Fifth*: | The overall scope of the conspiracy involved at least 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, 50 grams or more of methamphetamine |

(actual); 400 grams or more of a mixture and substance containing a detectable amount of N-phenyl-N- [1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl), Schedule II controlled substances; or 1 kilogram and more of a mixture and substance containing a detectable amount of heroin.

10th Circuit Pattern Jury Instructions § 2.87, Controlled Substances—Conspiracy (2021).

### Count Fifty-Two:  18 U.S.C. § 1956(h)

**First**:        two or more people agreed to try to accomplish a common and unlawful plan to violate 18 U.S.C. § 1956;[2]

**Second**:        the defendant knew about the plan's unlawful purpose and voluntarily joined in it; and

**Third**:        there was interdependence among the alleged conspirators

11th Circuit Pattern Jury Instructions § 74.5, Money Laundering Conspiracy (2021); *see United States v. Keck*, 643 F.3d 789, 794 (10th Cir. 2011).

### III.    STATUTORY PENALTIES

The statutory penalty for Count 2 is not less than 10 years, not more than life

imprisonment; not more than a $10,000,000 fine, or both; not less than 5 years

supervised release; and a $100 special assessment fee.

---

[2] The elements of 18 U.S.C. § 1956(a)(1)(B)(i), for example, are:

**First**:        the defendant conducted or attempted to conduct a financial transaction;
**Second:**        the financial transaction involved the proceeds of a specified unlawful activity, to wit, the importation, sale, or distribution of controlled substances;
**Third:**        the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and
**Fourth:**        the defendant conducted or attempted to conduct the financial transaction knowing that it was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity.

*10th Circuit Pattern Jury Instructions* § 2.73.1, Money Laundering Concealing Illegal Proceeds (2021).

The statutory penalty for Count 52 is not more than 20 years imprisonment; not more than the greater of a $500,000 fine or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, or both; not more than 3 years supervised release; and a $100 special assessment fee.

If a term of probation or supervised release is imposed, any violation of the terms and/or conditions of supervision may result in an additional term of imprisonment.

## IV.   COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury. If the defendant is an alien, the conviction may cause the defendant to be deported and removed from the United States, or confined indefinitely if there is no country to which the defendant may be deported, denied future admission into the United States, and/or to be denied citizenship.

## V.   STIPULATION OF FACTS

The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts that may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties stipulate that the following facts are true and correct.

From at least March 19, 2019 until February 12, 2020, the defendant, based in Aurora and Denver, within the District of Colorado, organized the interstate transportation and local distribution of large quantities of illegal drugs.  The defendant worked with Mexico-based sources of supply to arrange pickups of illegal drugs from California-based intermediaries working with and for those Mexico-based sources of supply and, during the course of the FBI's investigation into her activities, arranged for the transport of large quantities of methamphetamine, heroin, cocaine, and fentanyl.  To effectuate her scheme of drug distribution, the defendant employed a network of co-conspirators, including interstate load runners, local runners, local multi-pound drug customers (who would, in turn, distribute to lower-level drug distributors), and lieutenants to coordinate the activities of the aforementioned co-conspirators.

The defendant was the leader of this conspiracy, engaging in acts furthering the conspiracy over the period enumerated above.  On March 19, 2019, an FBI confidential informant (CHS1) called the defendant and arranged the purchase of a pound of methamphetamine with her.  CHS1 traveled to the defendant's residence in Aurora and purchased the pound for $2,200 from the defendant directly.  DEA lab testing showed the product to be 422.8 g of 99% pure methamphetamine, resulting in 418.5 g of methamphetamine (actual).

Prior to March 27, 2019, CHS1 contacted the defendant to set up a controlled purchase of a pound of methamphetamine.  On March 27, 2019, CHS1 went to a parking lot in Aurora to complete this purchase, as dictated by the defendant.  CHS1 entered a Dodge Ram registered to the defendant's address and purchased methamphetamine from co-defendant Humberto Gastelum-Verdugo, one of the defendant's workers, for $2,200.  DEA lab testing showed the substance to be 439.6 g of 99% pure methamphetamine for a total of 435.2 g of methamphetamine (actual).

On April 11, 2019, another FBI confidential human source (CHS2) contacted the defendant over WhatsApp to initiate a controlled purchase.  CHS1 completed the purchase, meeting Gastelum-Verdugo near a Metro PCS store in Aurora inside a red Mercedes to purchase methamphetamine for $2,200.  DEA lab testing showed the substance to be 439.2 g of 85% pure methamphetamine, for a total of 373.3 g of methamphetamine (actual).

On April 25, 2019, a vehicle containing a load of narcotics, destined for the defendant in Denver, Colorado, was stopped by the Utah Highway Patrol.  The defendant contacted CHS2 over WhatsApp and sent booking photos of the two individuals arrested in Utah, indicating that the two men arrested were her narcotics load runners.  Utah Highway Patrol and FBI agents found approximately fifty pounds of methamphetamine concealed inside the vehicle.

On April 30, 2019, CHS2 contacted Vallejo-Gallo over WhatsApp to initiate a controlled purchase.  CHS1 contacted Vallejo-Gallo to arrange the time and place of the purchase of methamphetamine.  The purchase took place in Aurora, where CHS1 entered a red Pontiac G6 being driven by Gastelum-Verdugo and purchased

methamphetamine for $2,200.  DEA lab testing showed the substance to be 442.8 g of 98% pure methamphetamine, for a total of 433.9 g of methamphetamine (actual).

On May 22, 2019, CHS1 contacted the defendant to arrange a controlled purchase of methamphetamine.  CHS1 later entered a blue Pontiac G6 where co-defendant Omar Rivas-Saenz, a lieutenant of the defendant's, provided CHS1 with methamphetamine at the defendant's direction in exchange for $2,200.  DEA lab testing showed the substance to be 453.0 g of 98% pure methamphetamine for a total of 443.9 g of methamphetamine (actual).

On June 19, 2019, CHS1 contacted the defendant to set up a controlled purchase of methamphetamine.  CHS1 entered a Dodge Ram near a Burger King in Denver and exchanged $2,200 for methamphetamine, provided by co-defendant Mario Ibanez-Montes, another of the defendant's lieutenants, at the defendant's direction.  DEA lab testing showed the substance to be 445.3g of 98% pure methamphetamine, for a total of 436.3 g methamphetamine (actual).

On July 4, 2019, FBI agents and task force officers observed the defendant meet with co-defendant Beatriz Adriana Martinez-Meza, an interstate load runner for the defendant, in front of the Crestone Apartment complex in Aurora, Colorado.  Martinez-Meza was returning from having made a load run to California to pick up drugs.  There, Ibanez-Montes and another male approached a Chevy Cruze, Martinez-Meza's vehicle, that had been backed into a garage and retrieved the load from the trunk of the Cruze.  They carried the load, packaged in boxes and five-gallon buckets, into the apartment complex.  Later, Ibanez-Montes confirmed with the defendant on an intercepted phone call that the load contained "65 pieces," that is, 65 pounds of methamphetamine.

On July 14, 2019, the defendant called Rivas-Saenz to arrange for the delivery of 10 pounds of methamphetamine to co-defendant Grecia Stephanie Torres-Pablo. Surveillance subsequently observed Torres-Pablo and co-defendant Alexis Aaron Hernandez-Reyes in a Red Dodge truck at a Walgreens.  The defendant, Martinez-Meza, and another female departed Ibanez-Montes's apartment — a stash house Ibanez-Montes occupied for the benefit of the defendant's drug trafficking organization — and traveled to the Walgreens, where they provided a bag containing 10 pounds of methamphetamine to Hernandez-Reyes, made contact with Torres-Pablo, and the bag was put into the bed of the pickup truck.

In July 2019, the defendant arranged for Martinez-Meza and co-defendant Michelle Josefina Castaneda, Martinez-Meza's daughter, to conduct a load run of narcotics from California to Colorado.  The defendant agreed to pay them for the trip. The trio left the Denver metropolitan area on July 19, 2019 and headed to southern California, where the defendant arranged for the purchase of large quantities of illegal drugs that were loaded into a Chevy Cruze.  Martinez-Meza and Castaneda drove the Cruze back to Colorado from July 21 to July 22, 2019.  The defendant flew back to Colorado separately, awaiting arrival of the drugs.

In the early morning hours of July 22, 2019, a Colorado State Patrol trooper conducted a traffic stop of the Chevy Cruze near Grand Junction, Colorado.  A sheriff's deputy arrived and deployed his K-9 around the exterior of the Cruze.  The dog alerted to the bumper along the driver's side front door and along the passenger side of the vehicle.  The trooper asked for and received consent to search the vehicle and its contents from Martinez-Meza and Castaneda.

In the trunk of the Cruze, the trooper found two pieces of luggage containing large amounts of drugs.  A state patrol sergeant weighed the drugs, which included methamphetamine weighing about 90 pounds, cocaine weighing about 4.5 pounds, heroin weighing about 2.3 pounds, and fentanyl weighing about 1.3 pounds.  Martinez-Meza and Castaneda were placed under arrest.

Some of those drugs were sent for testing from the DEA Western Laboratory. Approximately eight kilograms of the methamphetamine were tested, which revealed that it was 99% pure for a total of 7,965 grams of methamphetamine (actual).  Further testing showed 1,951.2 grams of cocaine, 994.4 grams of heroin, and 530.3 grams of fentanyl pills.

On July 31, 2019, intercepted calls indicated the delivery of 46 pounds of methamphetamine in a load carried by co-defendant Jesus Ruiz Velasco-Ochoa, an interstate load runner for the defendant.  Velasco-Ochoa met Ibanez-Montes, the defendant, and Rivas-Saenz at a location in Aurora.  At a garage at 10550 E. Iowa Ave., Aurora, CO, agents observed the load, carried in a black and yellow storage container, being transferred into Rivas-Saenz's vehicle.  Ibanez-Montes and Rivas-Saenz then traveled to Ibanez-Montes's apartment complex at 425 S. Galena Way, Aurora, CO, and carried the load into Ibanez-Montes's apartment.

That same day, CHS1 spoke with the defendant to arrange for the purchase of methamphetamine.  CHS2 met Vallejo-Gallo at her residence at the Ridge at Lowry Apartments in Denver.  There, CHS2 exchanged $2,200 with Vallejo-Gallo for methamphetamine.  DEA lab testing showed the substance to be 442 g of 90% pure methamphetamine, for a total of 397 g of methamphetamine (actual).

On August 9, 2019, the defendant was intercepted speaking with her minor daughter, V.G., and indicated that she could earn five dollars per hour to count approximately 15,000 blue pills. V.G. indicated that she would go to a house to do so. Seizures of other blue pills in this investigation indicated that they contained fentanyl.

On August 23, 2019, a green Toyota registered to co-defendant Edgar Abraham Esquivel-Tecalco, an interstate load runner for the defendant, arrived at the same garage at the Crestone Apartments as had Martinez-Meza, having come from a California load run to pick up drugs. The defendant, along with co-defendant Eber Uriel Perez-Ramirez, met the Toyota there and, together, they drove to Ibanez-Montes's apartment complex in Aurora, where they met Ibanez-Montes. Ibanez-Montes and the driver of the Toyota retrieved several packages, which Ibanez-Montes carried into the apartment complex there. Later intercepted phone calls amongst members of the defendant's organization confirmed that at least 57 pounds of methamphetamine had been delivered in this load run.

On September 3, 2019, the defendant called Rivas-Saenz, indicating that she was awaiting his arrival so that they could together weigh a load of methamphetamine that arrived. The defendant indicated that she sent Perez-Ramirez to retrieve the load and that 50 pounds of methamphetamine had come in, wrapped in large packages. The defendant discussed redistribution of the load and customers to whom the load should go with Rivas-Saenz. As observed by surveillance agents, Rivas-Saenz met with the defendant and Perez-Ramirez that day in Aurora, CO to accomplish the aforementioned objectives with the 50-pound load of methamphetamine that had arrived.

From September 7, 2019 until September 9, 2019, the defendant delivered instructions to Esquivel-Tecalco to pick up illegal drugs in California and coordinate with her for the transport of those illegal narcotics to the Denver metropolitan area for distribution. Esquivel-Tecalco complied with those instructions, picked up drugs, and set out from California to Denver with the drugs. On September 9, 2019, Esquivel-Tecalco was en route when a Colorado State Patrol ("CSP") trooper stopped him near Glenwood Springs, Colorado. The trooper conducted a search of Esquivel-Tecalco's vehicle and, inside the right rear, inside panel, the trooper found the first of several bricks. After pulling the brick out of the vehicle, based on his training and experience, it felt like methamphetamine. Troopers continued to search the vehicle and found packages in all four of the vehicle's door panels. Contraband was also found in the paneling of the rear lift gate.

A trooper tested the suspected drugs per CSP policy. All packages tested presumptively positive for methamphetamine. The total weight of the 62 packages pulled out of the vehicle was 92.93 pounds. Some of those drugs were sent for testing from the DEA Western Laboratory. That testing revealed that 7,135 grams of the substance was 96% pure methamphetamine, for a total of 6,849 grams of methamphetamine (actual).

On October 15, 2019, CHS1 requested methamphetamine from the defendant. The defendant directed CHS1 to a parking lot in Aurora. CHS1 and CHS2 met with Vallejo-Gallo and Perez-Ramirez in the parking lot, where Perez-Ramirez handed Vallejo-Gallo the methamphetamine, and Vallejo-Gallo provided it to CHS2. CHS1

provided $2,200 for the methamphetamine. DEA lab testing showed the substance to be 444 g of 39% pure methamphetamine for a total of 173 g of methamphetamine (actual).

On October 18, 2019, the defendant was intercepted speaking with "Cholito," an associate of co-defendant Luis Palacios. In the call, the defendant indicated to Cholito that they were "going to take the car away from" Ibanez-Montes "then send him over to Saint Peter" due to perceived disloyalty on Ibanez-Montes's part to the organization. Agents arrested Ibanez-Montes prior to the realization of this plan.

On October 21, 2019, Perez-Ramirez and co-defendant Kenia Vallejo-Gallo, one of the defendant's daughters, commenced a load run to California at the defendant's direction, where they coordinated with Velasco-Ochoa and others to pay for drugs and transport drugs back to Colorado. On their way back to Colorado on October 23, 2019, Utah State Patrol stopped them and refused to allow Velasco-Ochoa to drive any further because he was unlicensed. Luis Palacios and Candelaria Vallejo-Gallo thereafter sought a replacement driver, settling upon co-defendant Adela Guzman, Luis's sister-in-law.

At approximately 10:00pm, the Colorado State Patrol (CSP) conducted a traffic stop on the Nissan Altima driven by Guzman. A narcotics K-9 on scene alerted to the presence of narcotics in the vehicle. Based on the positive dog sniff, CSP searched the vehicle, discovering approximately 53 pounds of methamphetamine in a large suitcase inside the trunk of the sedan. Guzman was placed under arrest. A portion of the methamphetamine was sent to the DEA Western Laboratory for testing, which revealed that 7,437 grams of the methamphetamine was 100% pure.

On November 5, 2019, CHS2 contacted the defendant to request methamphetamine. CHS2 went to a parking lot in Aurora. The defendant and Perez-Ramirez arrived at the parking lot, and Perez-Ramirez placed methamphetamine into the CHS's vehicle in exchange for $4,400. The methamphetamine weighed approximately 889.2 grams and was tested by the DEA Western Laboratory and tested positive for methamphetamine with a substance purity of 99% +/- 6%.

On November 20, 2019, CHS2 called the defendant to arrange for the purchase of methamphetamine. The purchase occurred at a parking lot in Aurora. After CHS2 arrived there, Kenia Vallejo-Gallo, at the direction of the defendant, arrived in a Range Rover and conversed with the source through each vehicle's respective open windows. Co-defendant Javier Alejandro Vallejo-Gallo, the defendant's nephew, then exited the Range Rover and got into CHS2's vehicle, where he placed a brown bag of methamphetamine on the floorboard behind the passenger seat. CHS2 paid for the drugs with $2,200 of agency funds. The substance tested positive for methamphetamine with a weight of 445.7 g at 80% purity, for a total of 356.5 grams of methamphetamine.

In November 2019, FBI agents intercepted a call between the defendant and Luis Palacios in which the defendant indicated that she wanted Luis Palacios's "cholito" associates to kill Pueblito Cortes-Duran, indicted in related case 20-cr-25-PAB. At the direction of the FBI, a Federal Heights police officer informed Cortes-Duran that extra patrols were being initiated at her place of work and her residence due to a threat to her life, and Cortes-Duran informed the officer that she believed that it was the defendant who wanted to hurt her.

On November 25, 2019, CHS2 and the defendant had a text message conversation about heroin and cocaine.  CHS2 arrived at a parking lot in Aurora to complete a controlled purchase of heroin arranged with the defendant.  Several minutes later, co-defendant Tonatiuh Tacuba-Palacios, one of the defendant's workers, arrived in a Jeep Liberty, exited, and got into the CHS's vehicle.  CHS2 exchanged $1300 in agency funds for approximately 2 ounces of heroin, which Tacuba-Palacios provided.  DEA lab testing showed 50.2 grams of heroin.

On November 27, 2019, the defendant sent co-defendant Rosaura Vallejo-Gallo, another one of her daughters, to California to aid her in transporting a shipment of drugs from California to Colorado.  Two days later, at the defendant's behest, Rosaura followed and monitored a car carrying a load of drugs being driven by co-defendant Juan Felipe Cabrera, an interstate load runner for the defendant, from California to Colorado.  The Washington County (Utah) Drug Task Force stopped that car on November 29, 2019 in Utah while it was en route to the defendant in Colorado, and Rosaura delivered a real-time report of law enforcement's actions to the defendant.  Officers in Utah conducted a K9 search of the vehicle, finding approximately 47 pounds of methamphetamine concealed throughout the vehicle.  Cabrera was arrested.  The methamphetamine was sent to the DEA Western Laboratory, which tested it and found that it was 19,977 grams of 98% pure methamphetamine, for a total of 19,577 grams of methamphetamine (actual).

On December 4, 2019, CHS2 contacted the defendant to arrange for the purchase of methamphetamine.  The defendant indicated that Perez-Ramirez would deliver the methamphetamine.  The controlled purchase that day took place in a parking

lot in Aurora.  At the defendant's direction, CHS2 met with Perez-Ramirez in the parking

lot, who placed approximately one pound of methamphetamine in CHS2's vehicle.

CHS2 paid $2,200 for the drugs.  DEA lab results showed positive results for

methamphetamine, 443.5 grams, with a purity of 98%, for a total of 434.6 grams of

methamphetamine (actual).

On December 6, 2019, the Utah Highway Patrol interdicted a load of narcotics

near St. George, Utah.  During the interdiction, two cars were stopped, a silver

Volkswagen and a white Chevrolet Malibu bearing.  These vehicles were transporting

narcotics on behalf of the defendant's drug trafficking organization.  The silver

Volkswagen had been utilized during the aforementioned October 15, 2019 controlled

purchase.  Approximately two and a half pounds of heroin, one kilogram of fentanyl and

40 pounds of methamphetamine were recovered from the Malibu and the Volkswagen.

The methamphetamine was subsequently tested by the Drug Enforcement Agency

Western Regional Laboratory and was 95 percent pure resulting in 16,826 grams of

methamphetamine actual.  The defendant's load drivers, Tacuba-Palacios and co-

defendant Karen Denisse Lopez-Jimenez, were arrested following the seizure of

narcotics from the vehicles.

On January 22, 2020, at approximately 2:45 PM, FBI Agents intercepted a call

from the defendant inquiring about an undelivered package for which she provided the

tracking number and delivery address.  Later that day, FBI agents and task force

officers responded to leasing office for the address, which was in Denver,

Colorado.  After contacting office staff, they determined the next day that the package in

question was being held by the leasing office for the address because no apartment unit

number was listed on the package and the name on the package, "Joseph Garcia," did not match a resident of the apartment complex. The defendant attempted to have associates pick up the package. Kenia Vallejo-Gallo, who was a resident of the apartment complex, and Perez-Ramirez, for example, had attempted to pick up the package, but because the name on the package did not match their identities, management would not allow them to do so. After agents contacted management, a canine from the Denver Police Department (DPD) performed a dog sniff on the package in question, and the dog alerted on the package. The FBI seized and searched the package pursuant to a warrant and, once the package was open, four packages were discovered in a backpack. The packages were submitted to the DEA Western Laboratory for further testing, which revealed that they contained 8,897 grams of 65% pure methamphetamine, for a total of 5,783 grams of methamphetamine (actual).

On January 23, 2020, CHS2 negotiated the purchase of two pounds of methamphetamine from Candelaria Vallejo-Gallo for $4,400. FBI Agents monitored the purchase, which was recorded. Co-defendant Maria Monica Nieto-Estrada, a local runner for the defendant, showed up at a Denny's parking lot in Colorado and exchanged two pounds of methamphetamine for $4,400. DEA lab results showed positive results for methamphetamine with a purity of 97%, for a total of 857.5 grams of methamphetamine (actual).

From July 12, 2019 through October 16, 2019, the defendant was intercepted speaking with co-defendant Maria Guadalupe Sanchez-Gaytan about the purchase of a house in Mexico. Sanchez-Gaytan was aware of Vallejo-Gallo's drug activities: on July 16, 2019, for example, the defendant was intercepted telling Sanchez-Gaytan about her

Mexico-based sources of supply, an intermediary for a source of supply, and an interstate load runner. On July 23, 2019, the defendant discussed the July 22 interdiction of a load run described above and her need to pay money "over here" due to that interdiction.

With Sanchez-Gaytan's help, the defendant sent money through intermediaries into Mexico for Sanchez-Gaytan to invest in a house. On July 21, 2019, for example, the defendant was intercepted indicating that a "Chino" [Chinese man] had told her that the money would be "over there" in seven days. A separate interception between the defendant and Kenia Vallejo-Gallo on July 19, 2019 indicated that she gave a sum of money to two Chinese men. In addition, on September 4, 2019, the defendant was intercepted indicating that "they're" going to take the money to Lupita in Tepic, a city in Nayarit, Mexico. Sanchez-Gaytan clarified that "they" referred to the brother of Perez-Ramirez, and the defendant confirmed. On September 8, 2019, surveillance officers observed Candelaria Vallejo-Gallo in California looking closely at a white BMW SUV parked next to a Mexican tour bus at the Los Angeles Equestrian Center in Burbank. The tour bus was associated with the Mexican band El Coyote, for which Perez-Ramirez's brother plays. The SUV and the tour bus crossed back into Mexico on September 9. In other intercepted conversations, Sanchez-Gaytan and the defendant discussed the details of the house transaction through October 2019, including the avoidance of anti-money laundering laws and the fact that authorities searching for the defendant's assets would be searching in the United States, not Mexico. Sanchez-Gaytan ultimately used the proceeds of the defendant's drug trafficking business to purchase a house in Mexico on the defendant's behalf.

On February 12, 2020, FBI agents executed a search warrant for the defendant's

residence at 1590 South Iola St., Apt. 108, Aurora, Colorado.  They arrested the

defendant there.  They also seized $65,514 in United States currency, 63.1 grams of

methamphetamine, 167.3 grams of heroin, a box of shotgun shells, a loaded ten-round

magazine, and various items of personal property.  The defendant agrees that the

seized items listed above are properly forfeitable to the government. Specifically, the

defendant agrees that the U.S. currency seized from her residence constitute proceeds

from her participation in the conspiracy to distribute controlled substances in a violation

of 21 U.S.C. § 846.

## VI.    ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is

governed by 18 U.S.C. § 3553.  In determining the particular sentence to be imposed,

the Court is required to consider seven factors.  One of those factors is the sentencing

range computed by the Court under advisory guidelines issued by the United States

Sentencing Commission.  In order to aid the Court in this regard, the parties set forth

below their estimate of the advisory guideline range called for by the United States

Sentencing Guidelines.  To the extent that the parties disagree about the guideline

computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is

only an estimate.  The parties understand that the government also has an independent

obligation to assist the Court in making an accurate determination of the correct

guideline range.  To that end, the government may argue that facts identified in the

presentence report, or otherwise identified during the sentencing process, affect the

estimate below.

## Count 2

a)      As to **Count 2**, under Section 2D1.1(a)(5), the base offense level is 38.

b)      **Specific Offense Characteristics:**

    a. The parties agree that the defendant should receive a 2-level increase because she made a credible threat to use violence. USSG §2D1.1(b)(2).

    b. The parties agree that the defendant should receive a 2-level increase because the offense involved the importation of methamphetamine. USSG §2D1.1(b)(5).

    c. The parties agree that the defendant should receive a 2-level increase because she maintained a premises for the purpose of distributing a controlled substance. USSG §2D1.1(b)(12).

    d. The parties agree that the defendant should receive a 2-level increase because she received an aggravating-role adjustment under USSG §3B1.1 and involved an individual less than 18 years of age in the offense. USSG §2D1.1(b)(16)(B).

c)      **Role in the Offense:** The parties agree that the defendant should receive a 4-level increase because she was an organizer or leader of a criminal activity that involved five or more participants. USSG §3B1.1(a).

d)      The adjusted offense level is 50.

## Count 52

e)      As to **Count 52**, under Section 2S1.1(a)(1), the base offense level is 46. *See* USSG §2S1.1, App. Note 2(C).

f)      **Specific Offense Characteristics:**

    a. The parties agree that the defendant should receive a 2-level increase because she was convicted under 18 U.S.C. § 1956. USSG §2S1.1(b)(2)(B).

g)      No role-in-the-offense or victim adjustments apply to Count 52. *See* USSG §2S1.1, App. Note 2(C).

h)      The adjusted offense level is 48.

i)      Counts 2 and 52 group and, accordingly, the combined offense level is 50.  USSG §3D1.4.

j)      The parties agree that the defendant should receive a 3-level reduction pursuant to USSG §3E1.1 (acceptance of responsibility). The resulting total offense level is 43.  USSG §5A, App. Note 2.

k)      The parties understand that the defendant's criminal history computation is tentative and based on the defendant's prior convictions.  The parties believe the defendant is in criminal history category I.

l)      The career offender and armed career criminal adjustments do not apply.

m)      The advisory guideline range resulting from these calculations is life imprisonment.  The guideline range would not exceed, in any case, the cumulative statutory maximums applicable to the counts of conviction.

n)      Pursuant to guideline § 5E1.2 and 21 U.S.C. § 841(b)(1)(A), assuming the estimated offense level above is correct, the fine range for this offense would be $50,000 to $10,000,000, plus applicable interest and penalties.

o)      Pursuant to guideline § 5D1.2 and 21 U.S.C. § 841(b)(1)(A), if the Court imposes a term of supervised release, that term shall be at least five years.

p)      The parties agree that there is no restitution in this case.

The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range.  In doing so, the Court is not bound by the position of any party.

No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or

to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines.  Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

This plea agreement is governed by Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  As stated, the parties request a sentence of imprisonment not to exceed 288 months.  Because this plea agreement is made pursuant to Rule 11(c)(1)(C), the Court is bound by the parties' agreement once the Court accepts the plea agreement.  Alternatively, if the Court determines that it intends to impose a sentence different from that agreed to by the parties as part of this agreement, the Court must first give the parties an opportunity to withdraw from this agreement before it may impose any such different sentence.

//

//

//

//

//

//

//

//

//

## VII.   ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances.

Date: 10-28-21

Candelaria Vallejo
Candelaria Vallejo-Gallo
Defendant

Date: 10-28-21

Mark C. Johnson
Attorney for Defendant

Date: 11/5/21

Cyrus Y. Chung
Assistant U.S. Attorney